## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

STEPHEN WAGNER,                                    Case No. 19-cv-940 (MJD/ECW)

           Plaintiff,

     v.                                         **ORDER**

FRANCHOICE, INC. and
CAREYANN GOLLIVER,

        Defendants.

This matter is before the Court on Plaintiff's Motion to Amend Complaint (Dkt. 77) ("Motion").  For the reasons stated below, the Motion is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    General Background**

Plaintiff initiated this case on April 4, 2019 along with the filing of several related cases (involving different plaintiffs) against Defendant FranChoice, Inc. ("FCI"), a franchise broker, and a number of its agents, including Defendant Careyann Golliver ("Golliver"), related to their referral of a franchise opportunity to Plaintiff involving non-party ILKB, LLC ("ILKB"), the franchisor of "iLoveKickboxing.com" franchises.  (*See* Dkt. 1.)

In response to Defendants' motion to dismiss the Complaint (in the present case and some other related cases), on May 21, 2019, Plaintiff filed an Amended Complaint. (Dkt. 13.)  While the Complaint contained a fraud claim, Defendants argued that the claim should be dismissed because the claims lacked sufficient specificity pursuant to

Rule 9(b) of the Federal Rules of Civil Procedure. (Dkt. 10 at 1.) The Amended

Complaint also contained a claim for common law fraud. (Dkt. 13 ¶¶ 42-45.)

Defendants then filed a Motion for Partial Dismissal of the Amended Complaint on June

4, 2019. (Dkt. 14.) However, Defendants did not move to dismiss the fraud-related

claim for a lack of particularity under Rule 9(b). (*See* Dkt. 16.)

**B.     The Parties' Joint Discovery Plan and the Court's Scheduling Orders**

On May 14, 2019, counsel for both parties developed and filed a Joint Discovery

Plan applicable to this case and the other seven cases that had been filed at that time.

(*See Mount Holly Kickboxing LLC v. FranChoice, Inc.*, Case No. 19-cv-300

(MJD/ECW), Dkt. 24.) The Joint Discovery Plan provided in relevant part as follows:

> The parties have collectively identified the following factual issues which
> should be common to all cases in ILKB Franchisee Claims- Wave I and
> ILKB Franchisee Claims- Wave II:
>
> * * *
>
> (3) the role of FranChoice and its consultants generally in assisting
> franchisee candidates in their quest for franchise opportunities;
>
> (4) FranChoice's guidelines, directions, protocols, and marketing
> representations to franchisee candidates with respect to FranChoice's role
> and its compliance with any applicable franchise sales laws;
>
> (5) FranChoice's procedures in working with franchisee candidates
> generally;
>
> (6) the basis for FranChoice's representations regarding their role and
> expertise in assisting franchisee candidates find franchise opportunities;
>
> (7) the franchisor business of ILKB, LLC;
>
> * * *

2

With regard to the above common fact issues, the parties agree that there is not a need for duplication of discovery efforts.  Accordingly, the parties agree that[:]

(a) Plaintiffs in the Mt. Holly Kickboxing case will promptly serve documentary discovery on the common factual issues set forth above which are part of the discovery allowed below under "Additional Joint Discovery Issues," Section 2(b).  As with all discovery of common fact issues, responses to that discovery may be used in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims –Wave II.

(b) After sufficient documentary discovery is completed, one 30(b)(6) deposition of FranChoice will be conducted regarding the above common factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II; and(c)

After sufficient documentary discovery is completed, one 30(b)(6) deposition of non-party ILKB, LLC will be conducted regarding the above factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II.

(*Id.* at 3-4.)  Plaintiff began propounding written discovery in May 2019.  (Dkt. 84-1.)

Subsequently, while the Motion for Partial Dismissal was pending, the Court issued a Pretrial Scheduling Order in the present matter on September 4, 2019, which set the following relevant deadlines:

The parties must commence fact discovery procedures in time to be completed on or before **May 1, 2020**.

* * *

1. Except as otherwise specifically set forth this section, all motions that seek to amend the pleadings or to add parties must be filed and served **within 30 days of the Report and Recommendation on the pending motion to dismiss**.

2. All motions that seek to amend the pleadings to include punitive damages, if applicable, must be filed and served on or before **October 1, 2019**.

3. Except as otherwise specifically set forth this section, all non-dispositive motions and supporting documents, including those that relate to fact discovery, shall be filed and served on or before **March 20, 2020**.

(Dkt. 33 at 2, 4 (emphases in original).)  The Report and Recommendation on the partial motion to dismiss was issued on December 19, 2019 (Dkt. 51), making the deadline to amend the pleadings January 18, 2020.

An Amended Pretrial Scheduling Order was issued by the Court on February 3, 2020.  (Dkt. 59.)  Fact discovery was extended to **September 1, 2020**.  (*Id.* at 2.)  Non-dispositive motions relating to fact discovery were due on **September 21, 2020**.  (*Id.*)  Dispositive Motions must be filed on or before **January 15, 2021**.  (*Id.*)  Otherwise, the relevant deadlines remained the same.

A Second Amended Pretrial Scheduling Order was issued by the Court on April 2, 2020.  (Dkt. 66.)  Fact discovery was extended to **November 2, 2020**.  (*Id.* at 2.)  Non-dispositive motions relating to fact discovery were due on **November 20, 2020**.  (*Id.*)  Dispositive Motions must be filed on or before **March 15, 2021**.  (*Id.*)  Otherwise, the relevant deadlines remained the same.

A Third Amended Pretrial Scheduling Order was issued by the Court on November 10, 2020.  (Dkt. 89.)  Fact discovery was extended to **December 17, 2020**.  (*Id.* at 2.)  Non-dipositive motions relating to fact discovery were due on **January 5, 2021**.  (*Id.*)  Dispositive Motions must be filed on or before **May 3, 2021**.  (*Id.*)  Otherwise, the relevant deadlines remained the same.

**C.     First Motion to Amend to Add Punitive Damages**

Plaintiff previously filed a timely motion to amend the Complaint to add a claim

for punitive damages.  (Dkt. 36.)  The only substantive addition to the Amended

Complaint was Count VI seeking punitive damages.  This proposed count incorporated

the allegations in the preceding paragraphs and then alleged as follows:

50.     Defendants deliberately and intentionally disregarded the rights of
Plaintiff and disregarded the substantial likelihood of serious injury and
damages to Plaintiff by representing that they offered to match Plaintiff only
with franchises that Defendants had investigated and vetted; that such
franchises were of high quality; and that Defendants would provide Plaintiff
with all knowledge necessary to make an informed decisions,
when, in fact:

- Defendants knew that the founder of ILKB, Michael Parrella, had
filed for bankruptcy in 2003 and that his discharge had been vacated
in 2008; and knew or should have known, in the exercise of reasonable
inquiry of Parrella's bankruptcy consistent with their representations
to Plaintiffs, that Parrella's discharge had been revoked for failure to
pay federal taxes and that there were two adversary proceedings in the
bankruptcy accusing Parrella of fraud and fraudulent transfers.

- Defendants failed to perform any serious, systematic or professional
due diligence upon ILKB; instead all they did was talk to a few
existing franchisees, many of whom did not own the type of ILKB
franchise that Plaintiffs were considering buying and Defendants
prepared no report, summary or investigation of ILKB.

- Defendants simply took representations of ILKB about the nature of
the franchise including the representations that it was suitable for
absentee ownership; that no units had closed; that average ILKB
franchisees made revenues and profits at a certain level; and that
ILKB did all of the marketing for franchisees, and passed them on to
Plaintiffs without checking on them.

- Defendants knew that ILKB engaged in blatantly illegal marketing
techniques as early as March 2015 and never questioned whether such
techniques had ceased, thus exposing Plaintiffs to the high likelihood,
if not certainty, that Plaintiffs would be the victims of fraud.

> - Defendants disregarded complaints and warning signs from ILKB franchisees as the whining of "stupid, selfish and ungrateful franchisees" instead of investigating such complaints and determining whether they were true.
>
> - Defendants made specific representations as set forth above about ILKB without investigating or verifying them, when such representations were false and were known or should have been known to Defendants as false.

(Dkt. 38-2 ¶ 50.)

On May 6, 2020, the Court granted in part and denied in part the motion, allowing only the following allegations in support of the proposed Count VI for punitive damages to be added:

> Defendants deliberately and intentionally disregarded the rights of Plaintiff and disregarded the substantial likelihood of serious injury and damages to Plaintiff by representing that they offered to match Plaintiff only with franchises that Defendants had investigated and vetted; that such franchises were of high quality; and that Defendants would provide Plaintiff with all knowledge necessary to make an informed decisions [sic], when, in fact:
>
> > - Defendants made specific representations as set forth above about ILKB without investigating or verifying them, when such representations were false and were known or should have been known to Defendants as false.
>
> As a result of Defendants' deliberate disregard of Plaintiff's rights, Plaintiff are entitled to punitive damages.

(Dkt. 67 at 20-21 (alteration in original)).  In this regard, the Court allowed Plaintiff to claim punitive damages solely regarding the misrepresentations about ILKB:

> Plaintiffs' Motion is granted only to the extent that it seeks to add a claim for punitive damages in relation to the specifically alleged fraudulent representations made by Defendants to Plaintiffs that: (1) an ILKB franchise was suitable for absentee ownership, meaning that Wagner would only need to put in 5 to 10 hours a week of work; (2) ILKB had a perfect record in that no studios had failed over the prior five years; (3) ILKB franchises generated profits of $10,000 to $20,000 per month; (4) the typical investment for the

6

franchise was about $20,000, and that the high end to open a studio was $250,000; and (5) ILKB would handle all of the marketing activities for the franchise.

(*Id.* at 20.)

As part of its ultimate decision, the Court also found as follows:

The Court also agrees with Defendants that allegations in the proposed amended complaint regarding representations made by Defendants to Plaintiff offering to match them "only with franchises that Defendants had investigated" and then not conducting "any serious, systematic or professional due diligence upon ILKB" or taking ILKB's representations at face value at most amounts to gross negligence on the part of Defendants as to their duty to Plaintiff. However, the mere showing of negligence, even gross negligence, is not sufficient to sustain a claim of punitive damages. *See Ulrich*, 848 F. Supp. at 868. Moreover, there are no allegations, save for the alleged illegal marketing (addressed below), that would have given Defendants reason not to believe ILKB's representations so as to create a high probability of harm to Plaintiff.

(*Id.* at 17.)

On May 19, 2020, Plaintiff objected to this Court's Order on punitive damages. (Dkt. 68.)  No mention was made at that time that another amendment would be necessary.

On June 15, 2020, Senior United States District Judge Michael J. Davis affirmed the Order on punitive damages.  (Dkt. 70.)

## D.    Motions for Summary Judgment

In a related matter against FCI involving the same Plaintiffs' legal counsel, *Mount Holly Kickboxing LLC v. FranChoice, Inc.*, Case No. 19-cv-300 (MJD/ECW), on April 28, 2020, the Plaintiffs in that case moved for summary judgment on their claim under the North Carolina Deceptive and Unfair Trade Practices Act claim.  (*See* Case No. 19-cv-300, Dkt. 57.)  In their May 19, 2020 opposition, FCI asserted that "while [plaintiffs']

Complaint mentions some of the website statements, it does not identify them as misrepresentations—rather they appear to be identified in an effort to establish reliance. Accordingly, Plaintiffs' new theory should not be considered."  (*Id.*, Dkt. 86 at 33-34 (citations omitted).)

## E.     Present Motion to Amend

On August 24, 2020, Plaintiff filed the present Motion, which was heard by the Court on September 11, 2020.

The present proposed fourth amended complaint[1] deletes Count VI for punitive damages in its entirety.  It instead proposes to assert a claim for punitive damages under common law claims.  (Dkt. 80-2 at 24, ¶ 40.)[2]

The crux of the proposed amendments is focused on the alleged misrepresentations made by Defendants.  In the operative Third Amended Complaint, it appears that Plaintiff referred to representations made on FCI's website and by Golliver regarding their services and qualifications in terms of Plaintiff's reliance on Defendants' misrepresentations, but did not assert that they were in of themselves misrepresentations. (Dkt. 75 *compare* ¶¶ 10-11, 13, 17, *with* ¶ 12.)  The operative paragraph 10 provides:

> Through its website (https://www.franchoice.com/), which Wagner
> reviewed, FCI held itself out as directing prospective franchisees to "high

---

[1]     The Court notes that before Plaintiff filed the present motion to amend, the parties filed a stipulation to amend the then-operative Second Amended Complaint to delete allegations regarding punitive damages that were inadvertently included by Plaintiff in Count VI, which had been excluded by the Court.  (Dkt. 72.)  The Court granted the stipulation to amend and the operative Third Amended Complaint was filed on July 8, 2020.

[2]     Except for depositions, all page numbers refer to the CM/ECF pagination.

> quality franchise businesses that match your requirements" and that it would
> match "entrepreneurs like you with the perfect franchise business."  FCI
> stressed that Plaintiff could "avoid the confusion of researching" franchise
> opportunities and could focus on those franchises that FCI had "selected . . .
> as franchise businesses matching [his] requirements."  FCI further stated that
> "[t]hey will be by your side coaching you and making sure you are getting
> the information you need in order to make the best decision for you."

(*Id.* ¶ 10 (alterations in original).)

In his proposed amendment, Plaintiff also included a new header with respect to

paragraphs 11-12 titled "FCI's Representations About Its Services."  (Dkt. 80-2 at 15.)

With respect to the representations made to Plaintiff, proposed amended paragraph 11

(formerly paragraph 10) inserts modified representations made by Defendants that

Plaintiff read on FCI's website:[3]

---

[3]    The Court notes that the representations made by Golliver to Plaintiff as alleged in
paragraph 12 remain the same.  (Dkt. 82-2 at 18-19.)

**FCI's Representations About Its Services**

10 11 Through its website (https://www.franchoice.com/), which Wagner reviewed, FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business." FCI stressed that Plaintiff could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected …as franchise businesses matching [his] requirements." FCI further stated that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you." FCI further stated on its website:

 a. "We have carefully pre-screened hundreds of franchise companies." with "exacting standards" to provide "safe" and "high-quality" opportunities to candidates like Wagner

 b. FCI had examined the record of the franchisor relating to litigation to ensure safe and high-quality franchises.

 c. FCI would match Wagner with a business that met his requirements.

* * *

(*Id.* at 15.)

The remainder of the amendments deal with the falsity of the representations. While the operative Third Amended Complaint already asserts that the representations at issue are false, the proposed amended complaint contains more facts as to why the representations are false, especially as it relates to the new allegations regarding Defendants' alleged representations as to the services provided by FCI as stated on their website and by Golliver:

**The Falsity of ~~Defendant's~~Defendants' Representations About Their Services**

17.    Defendants' representations about their services were false in the following respects:

a.    FCI did not "pre-screen" franchisors with "exacting standards" to find "safe" or "high quality" franchises.  FCI screened franchisors only for the saleability of the franchise.  FCI did not screen for the length of time the franchisor had been franchising, the experience of its staff and executives, the number of franchisees who had actually been operating for at least a year, the actual financial results of franchisees or any publicly available information about the franchisor, including its history of litigation or franchise law violations. FCI did not screen to determine if the franchisor was "safe" or of "high quality."

b.    FCI did not examine the record of the franchisor with respect to litigation; at the time that Wagner purchased the ILKB franchise, ILKB had at least four lawsuits alleging fraud, theft of services or violations of franchise laws that should have been disclosed, but which were not, in its Franchise Disclosure Document; ILKB's founder and CEO had filed for bankruptcy, which also should have been disclosed, and ILKB or its predecessor had entered into consent orders with the states of New York and Minnesota with respect to violations of their franchise laws.

c.    FCI and Golliver did not select franchises that met Wagner's requirements.  Specifically, ILKB was a high-risk, inexperienced franchisor with a history of fraud and bankruptcy of its CEO and founder, and the representations that Golliver made about it were false, as shown below.

**The Falsity of Defendants' Representations About ILKB**

~~16.~~18. After opening the business, Plaintiff learned that the representations that FCI and Ms. Golliver ~~and others~~ had made to Mr. Wagner about ILKB were not true:

(*Id.* at 17-18.)

## II.    <u>LEGAL STANDARD</u>

Plaintiff's Motion is generally governed by Rules 15 and 16 of the Federal Rules of Civil Procedure and Local Rule 16.3 of the Local Rules for the District of Minnesota.

**A.     Rule 15**

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of Wis. Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).  The Eighth Circuit has held that "[a]lthough amendment of a complaint should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend."  *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981)).  Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party."  *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B.     Rule 16**

Under Rule 15(a), leave to amend should be granted liberally, if "justice so requires."  However, the Eighth Circuit has held that when a party has filed a motion to amend the complaint after the deadline provided in a court's pretrial scheduling order, then the court may properly require, pursuant to Federal Rule of Civil Procedure 16(b), that good cause be shown for leave to file a pleading that is out of time with that order. *See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (citing *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999)).  "If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and

effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *In re Milk Prod. Antitrust Litig.*, 195 F.3d at 437-38 (citation omitted).

Scheduling orders pursuant to Rule 16(b)(1) "assure[ ] that at some point both the parties and the pleadings will be fixed . . . ." Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment. Moreover, "Rule 16(b) assures that '[a] magistrate judge's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded . . . without peril.'" *Archer Daniels Midland v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 582 (D. Minn. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Similarly, Local Rule 16.3 requires a party moving to modify a scheduling order to "establish good cause" for the proposed modification. Further, regarding the timing of when such a motion must be made, Local Rule 16.3(d) states, "[e]xcept in extraordinary circumstances, before the passing of a deadline that a party moves to modify, the party must obtain a hearing date on the party's motion to modify the scheduling order. The hearing itself may take place after the deadline."

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716-17 (8th Cir. 2008) (citing *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)); *see also* Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite

the diligence of the party seeking the extension.").  "[T]he 'good cause' standard [of Rule 16(b)] is an exacting one, for it demands a demonstration that the existing schedule cannot be reasonably met despite the diligence of the party seeking the extension." *Scheidecker v. Arvig Enters.*, 193 F.R.D. 630, 632 (D. Minn. 2000) (citation omitted).

While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, the Court will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. *See Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling order's] requirements").  In short, Rule 16(b) focuses on "the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of unpersuasive excuses, inclusive or inadvertence and neglect, which commonly undergird an untimely Motion to Amend." *Scheidecker*, 193 F.R.D. at 632 n.1 (citations omitted).

With these standards in mind, the Court turns to Plaintiff's Motion.

### III.   <u>ANALYSIS</u>

Plaintiff argues that good cause exists to allow what amounts to the fourth amended complaint on the grounds that the scheduling order called for motions to amend the pleadings to be brought by January 19, 2020 and Plaintiff did not depose FCI's founder and CEO, Jeff Elgin ("Elgin") about the representations about FCI's services until February 6, 2020, and did not depose its consultant, Golliver, until January 28, 2020.  (Dkt. 79 at 5, 7, 15.)  Defendants counter that not only was Plaintiff dilatory in

conducting discovery so as to meet the deadlines to amend, but that Plaintiff had already learned the information that he claimed to have learned from Elgin and Golliver by November 19, 2019, through FCI's Rule 30(b)(6) depositions and written discovery. (Dkt. 83 at 15-19.)

As a starting point, the Court does not comprehend why Plaintiff waited until November 2019 to start conducting depositions given the May 2019 Joint Discovery Plan, *supra*. While Defendants did not serve their responses to the May 2019 written discovery until the end of October 2019, it was incumbent on Plaintiff to seek relief from the Court if he felt it was necessary to meet his deadlines.

In addition, there is no reason why Plaintiff could not have previously made the allegations in paragraph 11 of the proposed amendment or characterized paragraphs 11 and 12 as "FCI's Representations About Its Services," as he is now attempting to do. These are all representations observed by Plaintiff on FCI's website or obtained by him from Golliver. This was information obviously in the possession of Plaintiff since the start of this action given that it stems from his own observations. While it is not entirely clear, it appears that Plaintiff is arguing that the reason why he could not allege fraud as to these representations is that he did not have enough evidence to determine that Defendants' representations were false for the purposes of the particularity requirement of Rule 9(b):

> [W]hile Plaintiffs believed that Defendants' representations about their services were misrepresentations, Plaintiffs did not have the evidence to meet the pleading requirements of Rule 9(b). Specifically, until it could be determined that FranChoice had not (a) pre-screened franchisors for quality or safety; (b) examined the record of the franchisor for litigation; or (c) knowingly did not provide Wagner with a franchise that did not meet his

15

needs.  Plaintiffs did not believe they could, in good faith, allege fraud
consistent with the requirements of Rule 9(b).

(Dkt. 79 at 15-16.)  Plaintiff claims that only by February 2020 was he able to conduct
the individual depositions of Elgin and Golliver, during which Plaintiff learned "that the
Services Representations were not simply negligence or gross negligence, but were
outright false and were known (or should have been known to Defendants) to be false."
(*Id.* at 7.)

It is difficult to comprehend why Plaintiff needed to shore up the particularity of
his existing fraud-related claims for the purposes of Rule 9(b).  The amended allegations
in proposed paragraph 11 are not materially different from the original allegations,
primarily using different language from the website or rephrasing the allegations and,
more importantly, now actually characterizing the representations relating to the services
Defendants provided as misrepresentations in their own right, as opposed to the basis of
Plaintiff's reliance on Defendants' representations as it is presently alleged.

Instead of the proffered reason for the amendments, it appears that this late-
proposed amendment was the result of a tactical decision by Plaintiff to address the
possible deficiency in his fraud-related claims regarding the extent of the actionable
misrepresentations involved, given the arguments made by FCI in opposition to
plaintiffs' motion for partial summary judgement in the earlier related *Mount Holly* case,
*see supra*, and to get another bite at the proverbial apple with respect to the extent of
punitive damages, given the Court's order denying part of his motion to amend to add
punitive damages.  However, such a tactical decision after the expiration of a deadline to
amend with respect to punitive damages and to amend the pleadings generally does not

amount to an extraordinary circumstance to bring the present untimely motion, let alone establish diligence for the purposes of the good cause requirement of Rule 16.  *See Morrison Enter., LLC v. Dravo Corp.*, 638 F.3d 594, 610-11 (8th Cir. 2011) (affirming district court's denial of motion for leave to amend on ground that a tactical choice not to pursue a claim earlier did not show diligence); *see also Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 09-cv-1091 (JNE/JSM), 2010 WL 4193076, at *7 (D. Minn. Oct. 7, 2010) ("A strategic decision at the beginning of the case to not allege a MUTPA claim, because Aviva did not believe it had a basis for punitive damages at that time, does not constitute good cause for seeking the amendment now."); D. Minn. LR 16.3(d).

In any event, even to the extent that the knowledge of the fraud needed to be pleaded with particularity, *see Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009) ("[W]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge . . . such allegations may be pleaded on information and belief."), the Court concludes that Plaintiff had sufficient information regarding the Defendants' screening process as a set forth in paragraph 17 of the proposed amended complaint as of November 2019, well prior to the January 2020 motion to amend deadline, and soon after the deadline to add a claim for punitive damages.  Specifically, during the November 18, 2019 FCI Rule 30(b)(6) deposition, Elgin testified that when determining whether a franchisor met their "exacting standards," this determination did not specifically include looking at a litigation history, although FCI used this factor to determine whether to refer a franchise, and did include looking at a franchisor's franchise disclosure documents ("FDD") to see if there are were bankruptcies or litigation history, and, if there were, to

ask the franchisor questions about this.  (Dkt. 84-2, Ex. G at 49.)  Other factors

considered were the period of time that a franchisor was in operation (there was not a

minimum amount of time required), whether the franchisees were happy, and whether

there were territories available.  (*Id.* at 50-51, 54.)  They also looked to the franchisor's

financials, as one of the many factors considered.  (*Id.* at 53.)  With respect to FCI

screening opportunities, Elgin testified:

> Q.    Okay.    This exhibit also refers to "pre-screened as high quality
> franchise businesses."
>
> What does "pre-screened" mean?
>
> A.    We prescreen franchisors, it means basically four things.  We review
> their FDD document, we conduct interviews with management executives at
> the franchise company, we conduct interviews  with existing franchisees, and
> we  either through interviews or through material review will see if they have
> a  good  communication  system,  documentation  system  for  their
> communication with prospective franchisees.

(*Id.* at 55.)  FCI's other Rule 30(b)(6) deponent, Trent Halvorson ("Halvorson"), FCI

Vice-President of Franchise Relations, testified on November 19, 2019 that FCI's

screening criteria involved looking for "happy franchisees" and talking with several

franchisees, looking at their current sales process, obtaining information from franchisees

as to whether there was strong unit economics, looking at some marketing materials, and

reviewing the FDD.  (Dkt. 84-2, Ex. I at 41-49, 53.)  In addition, Halverson testified that

FCI did not have in place any sort of standard regarding how long a franchisee would

need to be in business to be included as part of the validation process for onboarding a

franchise like ILKB.  (*Id.* at 116-17.)

As the screening relates to the FDD, Elgin testified that he "quickly reviewed the FDD and highlighted a few items" he wanted to talk about with Michael Parrella.  (*Id.*, Ex. G at 56.)  Halvorson testified that he focused primarily on items 3 and 20 of an FDD as part of his evaluation.[4]  (*Id.*, Ex. I at 53.)  Moreover, as to the FDD, Elgin testified that the FDD of a franchisor is not reviewed again after the initial "pre-screening."  (*Id.*, Ex. G at 56-57.)  Elgin also testified that information from its prescreening does not generally go to its consultants, such as Golliver, that the FDD is not provided to the consultants, and that it is not recommended by FCI that the consultant obtain a copy of the FDD.  (*Id.* at 67.)

With regard to bankruptcy and litigation history, Halvorson testified in November 2019 that he had reviewed the ILKB 2013 FDD and had read the item disclosing that Parrella had a bankruptcy in 2003 and that the order of discharge was revoked in January 2008, but did not understand what that meant.  (*Id.*, Ex. I at 61-62.)  The only other inquiry made regarding the bankruptcy was that Halvorson asked Parrella about the bankruptcy, and Halvorson relied on Parrella's representation that "its taken care of." (*Id.* at 62.)  Halverson also testified that he took the representation in the FDD that there was no litigation at face value with no further follow-up.  (*Id.* at 68.)  He further testified that the only other time that FCI looked at an FDD for ILKB was when there were increases in ILKB franchise fees (on two separate occasions).  (*Id.* at 135-36.)  Halverson

---

[4]    The ILKB 2013 FDD Item 3 related to litigation and Item 20 related to outlets and franchisee information.  (Dkt. 39-1 at 22.)

also noted in conjunction with the increases in franchise fees that FCI received a commission with respect to a sale of an ILKB franchise.  (*Id.* at 136-37.)

As set forth above, by November 2019, Plaintiff had information regarding Defendants' screening process or lack thereof, the application of the screening process as it related to ILKB, FCI's evaluation of the FDD (including the bankruptcy and litigation history), and the fact that the FDD was not shared with its agents, such as Golliver.

Moreover, the FDDs relied upon by Plaintiff, the litigation related to ILKB, and the discharge of Parrella's bankruptcy were all available to Plaintiff well before the January 18, 2020 motion to amend deadline, as the FDDs were produced by November 2019, the bankruptcy discharge had been previously used by Plaintiff in his initial motion to amend to add punitive damages in October 2019, and the records were otherwise publicly available for a period from 2013 through 2017.  (*See* Dkt. 85 ¶¶ 4-7, 12-13.) Indeed, the litigation, the bankruptcy, and Defendants' lack of due diligence in discovering this information, given its public availability, as well as the FDD, are all referenced in the May 2019 Amended Complaint.  (Dkt. 13 ¶¶ 16(c), 18.)

In sum, while some evidence may have been available after the January 18, 2020 cut-off for motions to amend, the key evidence on which Plaintiffs rely was available months before the motion to amend deadline expired.  Consequently, the failure of Plaintiffs to move to amend for more than half a year (or to seek an extension of time to amend) demonstrates a lack of diligence incompatible with good cause under Rule 16. *See Moldex Metric, Inc. v. 3M Co.*, No. CV 14-1821 (JNE/FLN), 2016 WL 845264, at *2 (D. Minn. Mar. 4, 2016) ("Although documents were produced and depositions took

place after July 1, a substantial portion of the evidence on which Moldex Metric relied to support its second motion was available to it months before July 1. Moldex Metric could have presented the essence of its second motion to amend to claim punitive damages by July 1. Its failure to do so reveals a lack of diligence that is incompatible with a finding of good cause."); *see also Aviva*, 2010 WL 4193076 at *7 ("[W]hile it is true that the depositions of Kalleymeyn and Harris were taken shortly before Aviva brought its motion to amend, it is also uncontroverted that Aviva knew virtually the same facts it learned at these depositions when it obtained [a declaration] . . . in April 2010 . . . .").

Even assuming that Plaintiff first learned of sufficient facts to bring the present proposed amendments by February 2020 as claimed, that does not explain why Plaintiff waited until the end of August 2020 to file the present Motion with respect to the scope of his misrepresentation-related claims or with respect to his claim for punitive damages.[5] Plaintiff appears to be trying to justify his failure to file the present Motion earlier by pointing to the fact that this Court ruled on his motion to amend to add punitive damages on May 7, 2020, which Judge Davis affirmed on June 16, 2020. (Dkt. 79 at 15.)

---

[5] Even assuming that Plaintiff met the good cause requirement, the Court agrees with Defendants that the proposed amended claim for punitive damages is futile. While Plaintiff asserts that Defendants knowingly made misrepresentations regarding FCI's screening services (Dkt. 80-2 at 15, 17-18, 20, ¶¶ 11, 17, 21), these alleged actions of Defendants on their face only plausibly allege at most what amounts to gross negligence on the part of Defendants as to their duty to Plaintiff. However, the mere showing of negligence, even gross negligence, is not sufficient to sustain a claim of punitive damages. *See Ulrich*, 848 F. Supp. at 868. Indeed, these allegations are similar to those previously rejected by the Court in the Plaintiff's first motion to amend as part of their proposed Count VI. (*See supra* at 5-6.)

However, even accepting this assertion at face value, considering the expiration of the motion to amend deadline in January 2020, it was incumbent on Plaintiff to take steps to protect his interests and comply with the mandates of the pretrial scheduling order by at least seeking a motion to extend the deadline to amend the pleadings to sometime after the Court's order on punitive damages, similar to what was initially set forth in the initial Scheduling Order (Dkt. 33) with respect to the motion to amend deadline and the then-pending Report and Recommendation on Defendants' partial motion to dismiss. *See AGA Med. Corp. v. W.L. Gore & Assocs., Inc.*, No. CV 10-3734 (JNE/JSM), 2012 WL 12888665, at *7 (D. Minn. Oct. 5, 2012) ("Even accepting this assertion at face value, considering that the acquisition had been completed over a year prior to the effective date of the licenses, it was incumbent on both AGA's corporate representatives and its litigation counsel, to take steps to protect the rights of the proposed St. Jude plaintiffs and comply with the mandates of the pretrial scheduling order, L.R. 16.3 and Rule 16."). Instead, Plaintiff waited at his own peril for to bring this Motion to apparently expand his theory of the misrepresentations at issue in this case both as to the merits of the underlying claims and for the purposes of punitive damages.

"This lack of action [by Plaintiff] may be careless, inadvertent, strategic or due to other pressing matters, but it does not amount to the requisite due diligence needed to bring the present motion." *AGA Med. Corp.*, 2012 WL 12888665, at *7 (citing *C.H. Robinson Co. v. Zurich Am. Ins. Co.*, Civ. No. 02–4794 (PAM/RLE), 2004 WL 1765320 at *1 (D. Minn. Aug. 05, 2004), quoting *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F.

Supp. 2d 1140, 1144 (D. Minn. 2003)) ("Carelessness does not excuse dilatoriness and 'offers no reason for a grant of relief.'").

For all of the reasons stated above, Plaintiff's Motion is denied.

## IV.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

Plaintiff's Motion to Amend Complaint (Dkt. 77) is **DENIED**.


DATED: November 25, 2020                          *s/Elizabeth Cowan Wright*
                                                  ELIZABETH COWAN WRIGHT
                                                  United States Magistrate Judge